[Civ. No. 15282. First Dist., Div. Two. Jan. 27, 1953.]

Estate of RAYMOND THEODORE RAPHAEL, Deceased. BERTHA RADO RAPHAEL, Appellant, v. HARRY RAPHAEL, Respondent.

Holbrook & Tarr, W. Sumner Holbrook, Jr., and J. Albert Hutchinson for Appellant.

Philip S. Ehrlich, Albert A. Axelrod, R. J. Hecht, Philip S. Ehrlich, Jr., and Irving Rovens for Respondent.

DOOLING, J.—Appellant Bertha Rado Raphael is the widow of Raymond Theodore Raphael and respondent Harry Raphael is the surviving brother of Raymond and the administrator of his estate. These persons will hereafter be referred to by their first names: Bertha, Raymond and Harry. Upon the death of their mother Raymond and Harry inherited her estate. Raymond was severely crippled with arthritis, never engaged in any lucrative occupation and the whole of his estate upon his death on February 20, 1946, consisted of the property inherited from his mother and its earnings and accretions. Harry had other interests and property and from one corporation in which Raymond had no interest Harry received income in the years 1943, 1944 and 1945 totaling in round figures $167,000. The brothers always lived together both before and after Raymond's marriage to Bertha and while Harry testified that he consulted Raymond about his loans and investments Harry was the "leg man" and attended to most of Raymond's business interests.

The present appeal is from an order of the probate court confirming, with some modifications, the report of a referee finding, against Bertha's claim, that certain money and property in the possession of Harry are not a part of Raymond's estate and from the order settling the final account. As to the several items hereinafter discussed, all of which were found by the referee and the court to belong to Harry, appellant claims that the evidence is insufficient to support the findings. In asserting this claim appellant relies heavily upon a

prior adjudication of the probate court, affirmed in 91 Cal. App.2d 931 [206 P.2d 391], "that all of the estate of Raymond Theodore Raphael, both real and personal, on the date of the death of said deceased was the community property of Raymond Theodore Raphael and his widow, Bertha Rado Raphael." This adjudication was based upon a finding that "Raymond Theodore Raphael transmuted all of his property . . . from its previous separate character to . . . community property . . . by an oral agreement which was fully executed. . . ." (91 Cal.App.2d 935.) At the time of this adjudication none of the property or money involved in this appeal was before the probate court and the parties are in disagreement as to the legal effect, if any, of this prior adjudication. At the hearing before the referee counsel for appellant was questioning her about this agreement when Mr. Axelrod, counsel for respondent, stated: "The court found, based upon certain testimony which was introduced in the Probate proceedings, that the property was community . . . she testified on certain matters on which the Appellate Court sustained a finding of the Probate Court that transmuted separate property into community property. We will be here another week if we go into that.

"The Referee: I think it is a matter of record what that agreement was.

. . . . . . . . . . . .

"Mr. Axelrod: There are findings on file, the Appellate Court's decision."

It is clear from this colloquy that counsel and the referee assumed that the transmutation agreement as found by the probate court and affirmed in 91 Cal.App.2d 931 was a binding adjudication that all property acquired by Raymond, insofar as the agreement could be legally operative thereon, was transmuted by that agreement into the community property of the spouses. ▉ Under the settled rule that a party cannot change his theory on appeal counsel for respondent having taken that position before the referee will not be permitted on appeal to depart from it. (3 Cal.Jur.2d 607.)

Before proceeding to a consideration of the several items on their merits two other propositions may be stated. 1. Respondent claims that because no motion for new trial was made appellant is foreclosed from raising the question on appeal that the evidence does not support the findings, citing *In re Riccardi*, 80 Cal.App. 66 [251 P. 650]. ▉ This case is out of line with the long settled rule that "the question of

the sufficiency of the evidence to support a finding . . . may be brought up on appeal from a judgment without having presented a motion for new trial.'' (3 Cal.Jur.2d 613; *Smith* v. *Lightston,* 182 Cal. 41 [186 P. 769].) 2. Appellant raises some objections on appeal to rulings of the referee excluding certain evidence. These questions are not open to appellant on the record presented. The sole objection made in the trial court in support of appellant's motion for an order rejecting the referee's report was: "Said motion will be made and based on the ground that the recommendation of the referee is contrary to the evidence produced.'' Having opposed the adoption of the referee's report by the probate court on the sole ground that "the recommendation of the referee is contrary to the evidence produced" appellant is limited on her appeal to the ground there stated. ■ No rule is better settled than the one that "questions not raised in the trial court will not be considered on appeal.'' (3 Cal.Jur.2d 604.) It is obvious that if appellant were dissatisfied with the referee's rulings in the rejection of evidence and had made that a ground of objection before the court the judge might have rereferred the matter to the referee to correct any errors in his previous rulings or might have taken the additional testimony himself. ■ It is proper in the orderly administration of justice that only such objections to a referee's report as are presented in the trial court may be urged against it on appeal. (22 Cal.Jur. 703-704.)

Raymond and Harry had a joint bank account and a joint-entry safe deposit box. Harry testified that in the safe deposit box at the time of Raymond's death there were securities belonging to Raymond, securities and money belonging to Harry and some property and documents belonging to third persons. He entered the box after Raymond's death without informing the bank that Raymond had died and removed the property of the third persons therefrom. Thereafter in the presence of a representative of the State Inheritance Tax Department the box was again opened. Harry took his own property and money which was separately labeled with his name and accounted to the estate for all property belonging to Raymond, which was similarly labeled with Raymond's name. There is no claim that Raymond had any interest in Harry's separate property simply because it was deposited in the joint-entry box. The claim appears to be that because Harry occupied a fiduciary relation the burden was on him to establish by clear and convincing evidence that no property

of Raymond's was taken from the box and appropriated by him. The "clear and convincing evidence" rule is one for the guidance of the trial court and all that is required on appeal is that the finding finds substantial support in the evidence. (*Viner* v. *Untrecht*, 26 Cal.2d 261, 267 [158 P.2d 3]; *Stromerson* v. *Averill*, 22 Cal.2d 808, 815 [141 P.2d 732].)

 Appellant's contention that the uncorroborated testimony of the fiduciary is not sufficient to rebut the presumption of unfair advantage is not supported by the citation of any controlling authority. Our courts have held to the contrary. (*Helbing* v. *Helbing*, 89 Cal.App.2d 224 and cases cited on pp. 230-231 [200 P.2d 560].)

Harry testified that as to the joint tenancy bank account some money belonging to Raymond and some money belonging to both was deposited therein, but that most of the money deposited was Harry's separate funds; that it was his practice to withdraw the money belonging to Raymond and pay it to Raymond in cash or by check and to withdraw his own funds for his own use as occasion or convenience dictated. Appellant claims that the money deposited in the joint account became the common property of Raymond and Harry and the transmutation agreement between the spouses converted Raymond's interest to community property. For this contention appellant relies upon *Yeoman* v. *Sawyer*, 99 Cal.App. 2d 43 [221 P.2d 225]. That case announced the rule that where a husband invested community funds in property acquired by a deed to the husband and his paramour as joint tenants, the joint tenancy character of the property was destroyed by the community property interest of the wife and a tenancy in common of the paramour and the community resulted. The case is not applicable to the facts presented by this joint tenancy bank account. It is clear from Harry's testimony that he did not intend a gift of his separate funds deposited in the joint account and as to all of his own funds withdrawn therefrom during Raymond's lifetime the presumption of equality of interest in the funds deposited by Harry could be rebutted. (*Paterson* v. *Comastri*, 39 Cal.2d 66, 71 [244 P.2d 902].) On the evidence produced, since appellant did not establish that any of Raymond's funds which were deposited in that account were not afterwards withdrawn and repaid to Raymond (with the single exception of the Fallis loan hereafter discussed) and Harry testified that they were, we cannot find that the referee's conclusion adopted by the court

that such funds were Harry's is not supported by the evidence.

██ The brothers received a United States bond from their mother. It stood, according to the record made by the representative of the Inheritance Tax Department when the box was opened in his presence, in the name of Raymond payable on death to Harry. The referee found that on Raymond's death this bond became Harry's. Appellant argues that under the authority of *Yeoman* v. *Sawyer, supra,* 99 Cal.App.2d 43, by virtue of the transmutation agreement Raymond's interest therein became community property and the joint tenancy character of the bond was destroyed. This argument ignores the federal regulations governing such bonds referred to in *Davies* v. *Beach,* 74 Cal.App.2d 304, 306-307 [168 P.2d 452] and Civil Code, section 704. Specifically: ''A bond registered in the name of one person payable on death to another may not be reissued during the latter's lifetime to eliminate his name . . .

''If the registered owner dies without having presented and surrendered the bond . . . and is survived by the beneficiary, upon proof of such death and survivorship, the beneficiary will be recognized as the sole and absolute owner of the bond. . . .''

It is clear that the federal regulation is controlling and Raymond had no power unilaterally by the transmutation agreement with Bertha to divest Harry of his right of survivorship in the bond.

██ The furniture in the home occupied by the parties had belonged to the mother of Raymond and Harry. Harry testified that the mother gave it to him before her death. He could not remember the language used but no motion to strike his testimony on the ground that it was the conclusion of the witness was made. We are satisfied that the evidence is sufficient to support the finding of a gift to Harry. ██ It is urged that no delivery was shown, but as between members of the same family living in a common home it is not necessary that bulky articles given be removed from the common home to constitute delivery, but only that dominion and control be given by the donor to the donee. (*Robinson* v. *Hoalton,* 213 Cal. 370 [2 P.2d 344]; *Graham* v. *Griffin,* 66 Cal.App.2d 116 [151 P.2d 879]; *Wiley B. Allen Co.* v. *Edwards,* 29 Cal.App. 184 [154 P. 1066]; 38 C.J.S. 803.) In this connection the fact that the furniture was not inventoried in the mother's estate

of which Raymond and Harry were joint executors has some significance.

In 1943 a parcel of real property referred to as the "Marina lot" was purchased for $10,000 and the deed taken in the names of Raymond and Harry as joint tenants. In 1945 the lot was sold for $12,500. The profit went to Raymond and Bertha and Harry kept the $10,000. Harry testified that he deposited $10,000 of his own money in the joint bank account and paid for the lot with a check for that amount drawn on the joint account and that after the sale he made a gift of the profit to Raymond and Bertha. This evidence sufficiently supports the finding of the referee that the estate has no interest in this $10,000. Where one person pays the purchase price for property and it is taken in the name of another a resulting trust arises in favor of the person paying the purchase price, in the absence of evidence of a gift. (Civ. Code, § 853; 25 Cal.Jur. 178.) Such trust may result where the person paying the purchase price and the other take title in joint tenancy. (*Rowland* v. *Clark*, 91 Cal. App.2d 880 [206 P.2d 59]; 3 Scott on Trusts, § 454.6, p. 2293.) Since the referee was entitled to conclude that Raymond held only the naked legal title in joint tenancy as trustee for Harry there was no substantial property interest in Raymond which could become the community property of Raymond and Bertha under their transmutation agreement.

The home in which the parties lived until Raymond's death was held in joint tenancy under a deed conveying title to "Harry Raphael, a single man, and Raymond T. Raphael, as husband of Bertha Raphael" as joint tenants. Bertha, although she had no interest in the property so conveyed joined in the deed as a grantor. It is her claim now that since community funds went into the purchase and the deed ran to Raymond *as her husband* no true joint tenancy resulted but rather a tenancy in common of the community and Harry. It was stipulated before the referee "that Bertha Rado Raphael consented to Harry Raphael and Raymond Raphael taking the title as joint tenants." Particularly significant of the true intention of the parties is an answer filed by Bertha in an unlawful detainer action brought by Harry against her in the municipal court. That answer contained the following admission: "defendant admits that the property (referring to the home) . . . was owned by plaintiff and the deceased husband of defendant as joint tenants, but she

alleges . . . that . . . with one Angela M. Prendergast, as grantors, she executed a joint tenancy deed to said property to plaintiff and her husband with the sole and express condition that should her husband predecease her that plaintiff would acquire the title . . . and provide defendant with living accommodations in the dwelling house thereon; that her said husband did predecease her and by virtue of the joint tenancy deed plaintiff did acquire the title to said real property. . . ." The suit resulted in a judgment for Harry. It is argued that this judgment is res judicata of the title in Harry. We need not decide this question. The admissions in the answer above quoted which was verified by Bertha long before the present claim was asserted support the conclusion that the property was held in true joint tenancy and that the parties so intended.

During the lifetime of Raymond he purchased a Pontiac automobile. He transferred title to Bertha because, being a cripple, he could not secure public liability insurance. Bertha endorsed the pink certificate in blank and handed it to Harry who put it in the joint-entry safe deposit box. Raymond and Bertha continued to use the automobile until Raymond's death. After Raymond's death Harry sold the car for $1,875 and kept the money.

The referee found that Raymond gave the car to Bertha as her separate property and that Bertha in turn gave the car to Harry. Neither finding is supported by the evidence. Harry testified:

"Q. And she endorsed a certificate, the so-called pink slip, on the automobile, and gave it to you to put in the safe deposit box, is that correct? A. Yes sir.

"Q. That car continued to be used by her and by her husband until his death? A. By her husband."

Bertha testified:

"Harry gave me the slips and told me to sign, like he did everything else. Raymond gave me the car—Harry never owned that car."

The delivery of the pink slip to Harry, even though endorsed in blank, "to put in the safe deposit box" fails to show the essential element of donative intent and indeed actually negatives it. Intent on the part of the donor to make a gift is the primary essential. (13 Cal.Jur. 32, 36; *Union Mutual Life Ins. Co.* v. *Broderick*, 196 Cal. 497, 503 [238 P. 1034]; *Mutual Benefit Life Ins. Co.* v. *Clark*, 81 Cal.App. 546, 551 [254 P. 306].)

However because Bertha testified that Raymond gave her the car as a Christmas present and the referee found that it was her separate property respondent urges that the probate court has no jurisdiction over its proceeds. This argument overlooks the agreement found by the court as affirmed in 91 Cal.App.2d 935 and reiterated by Bertha in her testimony before the referee about this particular automobile "that everything he had was mine, and everything I had was his; that we were partners in everything, and everything was fifty-fifty." (91 Cal.App.2d 936.) The court said of the effect of this and similar testimony: "The object of the oral agreement of transmutation was fully performed when the agreement was made for it immediately transmuted and converted the separate property of each spouse into community property, and nothing further remained to be done." (91 Cal.App.2d 939.) The fact that title to her "Christmas present" was originally taken in Raymond's name and only transferred to her later because of the difficulty with insurance further reinforces the conclusion that although standing in Bertha's name it was in fact community property under the agreement of the spouses.

 Before Raymond's death the brothers lent $1,000 to one Fallis. The money was repaid on the very day of Raymond's death and on that date deposited in the joint account by Harry. Harry testified of this loan:

"Q. Mr. Raphael, at one time you and your brother jointly made a loan to an individual by the name of Fallis, is that correct? A. Yes sir. . . .

"Q. Is that loan still in operation, or has it been paid off? A. No sir, it has been paid off.

. . . . . . . . . . . .

"Q. Do you recall when that loan was repaid? A. He repaid $1000 on February 20, 1946."

The evidence is express that this particular loan was made by the *two* brothers to Fallis. Although the money to make it came from the joint account, money of both was deposited therein, and Harry did not testify in this instance as he did with regard to other transactions that his money alone went into this loan but instead he expressly stated that the two brothers made it together. The only rational conclusion is that one-half the amount of the loan was the community property of Raymond and Bertha. Harry's claim that he succeeded to this money as survivor of the joint tenancy account cannot be sustained. The particular deposit in the joint

account was obviously made by Harry without either spouse's knowledge since it was made on the very day that Raymond died, whether before or after his death does not appear. Under section 15a of the Bank Act as it then read the conclusive presumption of intention to vest title in the survivor of a joint bank account existed only "in the absence of fraud or undue influence." (Stats. 1929, p. 445.) To permit Harry because of his unilateral act in making this deposit of Raymond's and Bertha's community funds in the joint account without their knowledge or consent to invoke this conclusive presumption would be to work a fraud on them.

Insofar as they adopted the referee's report with regard to the Pontiac automobile and the Fallis loan the order confirming the referee's report and the order settling the administrator's final account are reversed and the court is directed to require the respondent administrator to account for the $1,875 received on the sale of the automobile and for $500 of the $1,000 received in payment of the Fallis loan. In all other respects the order confirming the referee's report and the order settling the final account are affirmed.

Goodell, Acting P. J., and Jones, J. pro tem., concurred.