182 Cal.App.2d 525 (1960)
Estate of EDWARD CHARLES SEARS, Deceased. EVELYN B. SEARS, Appellant,
v.
CALIFORNIA BANK (a Corporation), as Executor, etc., et al., Respondents.
Civ. No. 24251. 
California Court of Appeals. Second Dist., Div. Three. 
July 7, 1960.
 Roy W. Kurrasch for Appellant.
 Kenneth N. Dellamater and Roger J. Pryor for Respondents.
 BISHOP, J. pro tem. [fn. *]
 The widow of Edward Charles Sears initiated a proceeding under section 1080 of the Probate Code to establish that various properties held in his estate were community property, to one-half of which she was entitled. Several persons appeared to present conflicting interests. Of the findings of the trial court respecting some 14 categories of properties, two containing several items, the plaintiff expresses dissatisfaction with five, on this her appeal from the judgment determining interests. She feels aggrieved because she was found to have no interest in the proceeds of the sale of Sears' Ford, nor in the 500 shares of stock in the Times-Mirror Company that he owned, and a lesser interest in three insurance policies than she claimed. We have reached the conclusion that the trial court erred, not in finding as it did upon the evidence before it, but in striking some evidence that it had received and should have taken into consideration.
 Just a word should be said about the background of the parties. The marriage that gave the plaintiff her status as Sears' widow, took place just a little over a year before his death. She had been married before, out of which, after its annulment, she emerged with a house and a bank account. Sears, too, had been married, and appears on our scene with a daughter, Linda, a Ford, 500 shares of stock and three insurance policies. The community property of his marriage had become his separate property. Two of the policies he obtained as an employee of the Times-Mirror Company. The third was with the Metropolitan Life Insurance Company.
 Plaintiff's claims and contentions are based on a number of conversations which she had with Sears. Shortly after they were married he told her--all these conversations came from the plaintiff while a witness--that he owed $500 on his Ford but had no money with which to pay it. She replied: "I will let you have the money to pay it off but what security will I have?" His answer: "Well, you can consider you own half interest in the car and I have got the insurance made out in your name, also, you will share with Linda with the stuff that I have down at the Times, the interest that I *528 have down at the Times Mirror." All this was stricken on motion of a counsel representing interests opposing plaintiff.
 Again, after explaining that Sears' pay checks, received twice monthly, were cashed and put in a till and used by her for household expenses, the plaintiff related of complaining to him that the till was empty, requiring her to use some of her own money. His reply was "Use your money. I promise you when I __________. ... He said that everything down to the Times my insurance and the stock at the Times Mirror that you and Linda will share and share alike, and I said__________ I said, 'Well, all right, all right. Then I will go ahead and use my money.' " All this was stricken on the motion of opposing counsel. An offer to prove that the plaintiff spent $1,500 of her own money in reliance on Sears' promises, was denied.
 Now we come to an occasion in the month before Sears' death, in January 1958. He presented her with two documents, plaintiff's Exhibits 6 and 7, on the second of which, over the words "Signature of Spouse of Applicant" he asked her to place her signature, himself placing Exhibit 6 so that it covered all of Exhibit 7 except where she was to sign. When plaintiff inquired what it was all about he answered: "Well, this is to show that you and Linda are my sole beneficiaries of my stock and insurance policy of the Times Mirror," and he also said: "Here's a paper here that I am going to change my beneficiary in the Metropolitan Insurance Company to you." The paper last referred to was a third, neither Exhibit 6 nor 7. All this conversation was stricken, on motion.
 A few additional facts are needed to firm the foundations for plaintiff's arguments. Exhibit 7 appeared to be an application signed by Sears for participation in the profit-sharing plan for employees of the Times-Mirror Company. It provided that the beneficiary, to receive any death benefits payable under the terms of the plan, should be the Estate of Edward C. Sears. It bore a note to the effect that if this applicant is a married man and the named beneficiary is other than his spouse, it must be signed by the spouse. It also contained this further notation: "Supersedes application dated 8/15/46."
 The Metropolitan Life Insurance Company had issued a life insurance policy to Sears in 1941, his mother being named as beneficiary. In 1952, his 2- year-old daughter Linda was substituted as beneficiary. Under date of January 29, 1958, *529 the plaintiff became the beneficiary, by a change made by Sears, and another change, made on February 13th, resulted in naming "Estate" as beneficiary. The sum of $1,175.79 was received from this policy, upon Sears' death, $34.68 of which was awarded to plaintiff, that being her half interest as measured by the amount of premiums paid from community funds during the marriage of Sears and the plaintiff.
 There are certain principles of law, now so thoroughly established that we need not fear that we are skating on thin ice if we venture upon them. [1] In Woods v. Security-First Nat. Bank (1956), 46 Cal.2d 697, 701 [299 P.2d 657], it is stated, supported by a number of citations: "It is settled that the separate property of husband or wife may be converted into community property or vice versa at any time by oral agreement between the spouses." [2] The change over may be made although the title to the property may remain of record in joint tenancy (Socol v. King (1950), 36 Cal.2d 342, 345 [223 P.2d 627, 629], and cases cited), or, in the case of an automobile, in the name of one or other of the spouses. (Estate of Raphael (1953), 115 Cal.App.2d 525, 534 [252 P.2d 979, 985].) [3] Nor is it necessary, to convert separate property into community property, that the magic words "community property" be used. As revealed in Kenney v. Kenney (1934), 220 Cal. 134, 136 [30 P.2d 398, 399], it was sufficient that the parties had orally agreed "... that all property then owned by them or subsequently acquired was to belong to them equally or, as respondent put it, "fifty-fifty.' " Similarly, in Estate of Raphael (1949), 91 Cal.App.2d 931, 936-937 [206 P.2d 391, 394], the husband's statement as related by his wife that "... everything he had was mine, and everything I had was his; that we were partners in everything, and everything was fifty-fifty" was sufficient to alter the status of their property. See further Estate of Raphael, supra, 115 Cal.App.2d 525 [252 P.2d 979]. An even broader declaration appears in Long v. Long (1948), 88 Cal.App.2d 544, 549 [199 P.2d 47, 50]: "It is not essential to show an express oral agreement, but the status of the property may be shown 'by the very nature of the transaction or appear from the surrounding circumstances.' (Marvin v. Marvin, 46 Cal.App.2d 551, 556 [116 P.2d 151].)" See also where the parties involved were only acting like a husband and wife, Cline v. Festersen (1954), 128 Cal.App.2d 380, 383-384 [275 P.2d 149, 151]."
 In several of the cases cited it has been said that the status *530 of property could be changed to that of community property by "an executed oral contract." We know of none that requires that the agreement be executed, and we read in Estate of Raphael, supra, 91 Cal.App.2d 931, 939 [206 P.2d 391, 395: "The object of the oral agreement of transmutation was fully performed when the agreement was made for it immediately transmuted and converted the separate property of each spouse into community property, and nothing further remained to be done."
 [4] Applying these principles to the situation under review, had the trial court come to make its Findings with the conversations still a part of the evidence before it, the conclusions reached could well have been different. Could have been different, we say, not would necessarily have been, for the credibility of the witness and the weight to be given her testimony and the inferences to be drawn, would have remained problems before the trial court. It could have found, however, that the Ford car and the stock in the Times-Mirror Company became community property, in which the plaintiff had a one-half interest not subject to Sears' testamentary disposition. (Prob. Code, 201.) The evidence was material and competent, and should not have been stricken.
 [5a] The evidence was material and competent to prove, also, that the proceeds from the insurance policies covering Sears as an employee of the Times-Mirror Company were community property. [6] We read in Sullivan v. Union Oil Co. of Cal. (1940), 16 Cal.2d 229, 237 [105 P.2d 922, 927]: "An insurance policy in legal contemplation is property, which can be sold, assigned or bequeathed by the owner thereof. As was said in Blethen v. Pacific Mut. Life Ins. Co., 198 Cal. 91, 98 [243 P. 431], 'Its pecuniary value to its owners was [is] as great as though they held a promissory note of the company for that amount, ...' " A policy is referred to in Estate of Wedemeyer (1952), 109 Cal.App.2d 67 [240 P.2d 8, 11], as representing a chose in action. If all the premiums are paid out of community funds, the proceeds from a policy are community property. (McBride v. McBride (1936), 11 Cal.App.2d 521 [54 P.2d 480, 481].) [7] "The proceeds of an insurance policy on the life of the husband are community property to the extent that the premiums were paid with community funds." (Estate of Foy (1952), 109 Cal.App.2d 329, 333 [240 P.2d 685].) It was said in Cook v. Cook (1941), 17 Cal.2d 639, 644 [111 P.2d 322, 326]: "... in an ordinary life insurance policy the insured's property *531 right therein is such that it may be passed by the insured by transfer, will or succession." [5b] In view of these conclusions, we are unaware of any reason why the character of Sears' insurance could not be changed by him so that it had the status of community property, one-half of which would go to the plaintiff as such, the remaining half to be disposed of by will as Sears desired.
 [8] When we come to consider the Metropolitan Life Insurance policy a new element is involved--the representation that Sears was making the plaintiff the beneficiary named in the policy. So it is that we have reached the conclusion that the conversation had at the time Sears secured plaintiff's signature to Exhibit 7, should not have been stricken. With that conversation before it, the trial court could, without flaunting reason, have believed that the consent to the change of beneficiary given by the plaintiff was good consideration for Sears' promise to make her the beneficiary of the Metropolitan life policy. True, it was not proven that she gave up a right when she gave her consent, although it may be inferred that she did, but whether she did or not, it is true that she did something she was not legally bound to do, and this would be good consideration for his promise. Surely his promise to make her his beneficiary was not to be understood as "just for a week or so." He carried out his promise and she, being named his beneficiary, acquired an equitable interest in the policy that he could not destroy by a further change in the beneficiary. (Reliance Life Ins. Co. v. Jaffe (1953), 121 Cal.App.2d 241, 243 [263 P.2d 82, 84].) Here again, had the evidence been retained, it would not insure that the trial court would move step by step from the fact of the conversation to the belief we have stated would be possible. The statement just made is not inconsistent with our conclusion that the evidence should not have been stricken. [9] Whether evidence is material and competent is a question of law, that does not depend for its solution upon the certainty that it will result favorably to the party offering it.
 [10] The conversations that we have been considering all took place, of course, prior to Sears' death. Insofar as they form a basis for concluding that his separate estate had become community property, or he had engaged to change his beneficiary, they were not subject to the objection that the Dead Man's Statute (Code Civ. Proc., 1880), served to close plaintiff's mouth. (Estate of Wieling (1951), 37 Cal.2d 106, 109 [230 P.2d 808, 810]; Estate of Wahlefeld *532 (1930), 105 Cal.App. 770, 773-774 [288 P. 870, 871]; and see Trabin v. Title Ins. & Trust Co. (1959), 52 Cal.2d 149, 152-153 [339 P.2d 136, 137-138], and cases cited.) Insofar as the conversations were introduced to prove that the plaintiff had been defrauded by Sears, giving her causes of action on that ground against the estate, the section (1880) would prevent her from testifying. But this was not the theory of her petition. She was pressing a claim to the state, not one against it. The motions to strike and the orders were not limited to those portions of the conversations that tended to prove fraud, but went to the entire conversations. As to that portion which tended to establish the change in character of the property included, the plaintiff was a competent witness.
 [11] Another reiterated ground of the objections to the conversations was that the statute of frauds (Code Civ. Proc., 1973), would not permit their consideration. The conversations were material to plaintiff's case at a point where the statute of frauds was not involved. If, with respect to the agreement to change the beneficiary in the Metropolitan life insurance policy, the statute of frauds did apply, after the agreement was executed, the statute became of no concern. (Freitas v. Freitas (1916), 31 Cal.App. 16, 19 [159 P. 611, 612]; Realty Corp. of America, Inc. v. Burton (1958), 162 Cal.App.2d 44, 57 [327 P.2d 948, 956-957].)
 For the reasons given, the findings and judgment determining interest in estate, as the final decree is called, is reversed.
 Shinn, P. J., and Ford, J., concurred.
NOTES
[fn. *] *. Assigned by Chairman of Judicial Council.